IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> WIS HOLDING COMPANY, INC., *et al.*,[1] <br> Debtors. | ) Chapter 11 <br> ) <br> ) <br> ) Case No. 18-11579 (___) <br> ) Joint Administration Pending <br> ) |

**DECLARATION OF TIMOTHY J. BERNLOHR IN
SUPPORT OF PETITIONS AND INITIAL MOTIONS**

I, Timothy J. Bernlohr, being duly sworn, state the following under penalty of perjury:

1. I am the Managing Member of TJB Management Consulting, LLC and chairman and sole remaining director of each of the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 case (this "Chapter 11 Cases").[2] I have been an independent director of each of the Debtors since February 1, 2017. In my capacity as chairman, I am generally familiar with the Debtors' day-to-day operations, business affairs and books and records.

2. I submit this declaration (the "Declaration") on behalf of the Debtors in conjunction with their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), filed on the date hereof (the "Petition Date"), commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases"), and in support of the various types of relief requested in certain applications and "first day" motions (each, a "First

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: WIS Holding Company, Inc. (2673); WIS Holdings Corp. (4184); Western Inventory Service, Inc. (2867); Washington Inventory Service (1851); WIS International, Inc. (1762); Labor Support International, Inc. (2151); and Service Support International, Inc. (2152). The Debtors' mailing address is 9265 Sky Park Court, Suite 100, San Diego, CA 92123-4312.
[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

1

Day Motion" and collectively, the "First Day Motions"). I am authorized to submit this Declaration on behalf of the Debtors.

3. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of value; (ii) constitutes a critical element in preserving and maximizing the value of the Debtors' assets, and enabling the Debtors to propose and confirm a plan of liquidation; and (iii) is in the best interests of the Debtors, their estates and creditors.

4. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of the Debtors' books and records, on information prepared or collected and supplied to me by other members of the Debtors' management teams and/or professionals retained by the Debtors, my discussions with other members of the Debtors' management team, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and present liquidity needs. In making statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information.

5. I am over the age of 18 and am competent to testify.

6. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

7. Part I of this Declaration provides an overview of the Debtors' business operations and describes the Debtors' corporate history and the circumstances surrounding the

commencement of the Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Motions.

### PART I – Background and Restructuring Strategy

**A.     Overview of the Debtors**

8.     Debtor WIS Holding Company, Inc. ("Parent") is a Delaware corporation and the ultimate parent of the remaining Debtors. Parent owns 100% of the equity interests of Debtors WIS Holdings Corp. ("Holdings") and Western Inventory Service, Inc. ("Western"), both of which are Delaware corporations.

9.     Holdings owns 100% of the equity interests of Debtor Washington Inventory Service, a California corporation ("WIS"). WIS was the primary operating entity prior to the Sale (as defined below) and owns all the remaining assets of the Debtors. WIS also owns 100% of the equity in Debtors WIS International, Inc.; Labor Support International, Inc.; and Service Support International, Inc., which are all Delaware corporations. An organizational chart showing the relationship between the Debtors is attached as **Exhibit A** hereto.

**B.     Overview of Debtors' Business Operations**

10.     As of January 1, 2017, the Debtors operated out of 189 offices in 42 U.S. states and nine Canadian provinces. Debtors were in the business of providing outsourced inventory verification services and retail merchandising services throughout the United States and internationally. The Debtors provided physical inventory verification for retail customers in order to manage and deter inventory shrinkage and to comply with annual GAAP audit requirements necessitating physical verification. They historically provided such services to a diverse customer base, including large retailers such as Walmart. As one of only two providers with a global platform, the Debtors completed more than 200,000 inventory counts annually.

C. **The Sale Process**

11.     After defaulting on their obligations under that certain First Lien Credit Agreement, dated as of December 20, 2012, by and among, WIS, as Borrower, Western Inventory Service Ltd., as Canadian Borrower, Antares Capital LP, as US Agent and Canadian Agent and the financial institutions from time to time party thereto as lenders (as amended, restated, supplemented or modified from time to time, the "First Lien Agreement"), the Debtors' (other than Western, who was not a guarantor of the First Lien Agreement) obligations under the First Lien Agreement became immediately due and payable. As a result of the default, Antares Capital LP (the "First Lien Agent") elected to pursue a foreclosure sale under section 9-610 of the Uniform Commercial Code. The Debtors subsequently determined that cooperating with the foreclosure sale process was in their best interests and in the best interests of their creditors.

12.     Ultimately, the Debtors and the First Lien Agent agreed to sell the Debtors' assets to Retail Services WIS, Corporation ("RSWIS"), a Delaware corporation sponsored by Centre Lane Partners, LLC ("Centre Lane"). The assets sold at the foreclosure sale included both assets encumbered by the First Lien Agreement as well as certain unencumbered assets of the Debtors. These assets, collectively, constituted substantially all the assets of the Debtors.

13.     To effectuate the foreclosure sale, the Debtors, the First Lien Agent, and RSWIS entered into that certain Foreclosure Sale and Asset Purchase Agreement dated as of June 8, 2017 (the "Asset Purchase Agreement") for the purchase of the all right, title and interest in, to or under all of the properties and assets of the Debtors (other than the Excluded Assets as defined in the Asset Purchase Agreement) of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business (as more fully defined in the Asset Purchase Agreement as the Purchased Assets) for the aggregate price of $222,330,504.81, plus the assumption of certain liabilities,

4

including, among other obligations, (a) liabilities related to the Assigned Contracts (as defined in the Asset Purchase Agreement), (b) taxes of the Debtors' foreign subsidiaries,[3] (c) the Debtors' accounts payable, and (d) all intercompany debt. The purchase price was allocated $221,330,504.81 for the assets encumbered by the First Lien Agreement and $1 million to unencumbered assets.

14. The sale to RSWIS closed on June 8, 2017. (the "Closing") At that time, the Debtors' assets (other than the Excluded Assets), liabilities (other than the Excluded Liabilities) and operations were transferred to RSWIS. As a result, the Debtors have no remaining employees and I am the sole remaining director of each of the Debtors. The Excluded Assets included (a) all tax refunds arising from the operation of the Debtors' businesses prior to Closing, (b) rights under the Debtors' D&O insurance policy and the proceeds thereof; (c) claims and causes of action against the First Lien Agent and its representatives, (d) Retained Restricted Cash, (e) retainers paid by the Debtors for professional services that were held by a professional prior to Closing, and (f) all rights of the Debtors under the Asset Purchase Agreement. The Excluded Liabilities include (a) taxes arising from the ownership or operation of the business prior to Closing, (b) liabilities for breach of any Assigned Contract prior to Closing, (c) debt (other than intercompany debt) arising on or prior to Closing, (d) liabilities related to litigation involving the Debtors that existed as of Closing, and (e) liabilities with respect to any of the Debtors' deferred compensation arrangements.

15. Since Closing, the Debtors and RSWIS have been operating under that the transition services provision of the Asset Purchase Agreement, which requires RSWIS to

---

[3] The Debtors' equity interests in their foreign subsidiaries were purchased by RSWIS in connection with the Sale. Accordingly, the Debtors no longer have any remaining foreign subsidiaries.

reasonably cooperate with the Debtors to determine the extent of transition services needed by the Debtors, including services necessary to facilitate the winding up of the Debtors' businesses.

16. As of the Petition Date, the Debtors have approximately $2 million in cash as well as another approximately $2 million in assets held in a "Rabbi Trust" (the "Rabbi Trust"). The Rabbi Trust agreement, which initially established a trust for the benefit of certain of the Debtors' former executives, provides that the assets of the trust remain subject to the claims of the Debtors' creditors in the event of an insolvency. Shortly after the Petition Date, the Debtors will be seeking an order requiring the trustee, Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Company to turnover the assets of the Rabbi Trust to the Debtors' estates for distribution to unsecured creditors.

**D.  Circumstances Leading to Debtors' Bankruptcy**

17. On December 4, 2014, certain of the Debtors' then-current and former employees filed a class action in the Southern District of California asserting claims under the Fair Labor Standards Act ("FLSA"). In Case No. 14-cv-02869-WQH-AGS, Mr. Richard Hose, on behalf of himself and all other similarly situated plaintiffs (the "California Action"), asserts that the Debtors violated FLSA by failing to compensate certain of the Debtors' employees for "off-the-clock" work, which if properly paid, would have required the Debtors to pay overtime to those employees for many workweeks. Mr. Hose further alleges that as a result of this unpaid work, he and other employees were regularly paid below the applicable federal minimum wage using an effective hourly rate calculation. Following Closing, Mr. Hose amended the Complaint to add RSWIS and Centre Lane as additional defendants in the California Action.

18. The Court in the California Action has conditionally certified a collective action. WIS, however, filed a motion to compel arbitration, asserting that any employee who signed an arbitration agreement should not be entitled to litigate in federal court, but rather should be

required to proceed individually pursuant to the applicable arbitration agreement. The Court granted WIS's motion to compel arbitration as to the vast majority of those in the class, and now nearly 14,000 plaintiffs are eligible to proceed with individual arbitrations in that action.

19. On January 17, 2018, Monica Arispe, a former employee of the Debtors in the Superior Court for the State of California for the County of Riverside filed a complaint against the Debtors under the Private Attorney General Act of 2004 ("PAGA"), which is a California state labor law (the "Arispe Action"). Another PAGA complaint was filed by Sierra Kangas, on behalf of herself, all others similarly situated, and the general public in the Superior Court of the State of California in and for the County of Stanislaus by (the "Kangas Action"). The Kangas Action was filed on January 31, 2018. On June 22, 2018, the PAGA Action was abated pending resolution of the Arispe Action.

20. Collectively, the foregoing litigation claims, as well as other assorted litigation against the Debtors have diminished the Debtors' limited remaining funds and has made it impossible for the Debtors to wind-down in a state law dissolution proceeding without the benefits afforded by the automatic stay. Accordingly, the Debtors have elected to commence the Chapter 11 Cases to quickly identify the universe of creditors with claims against them and then distribute their remaining assets to those creditors on a pro rata basis.

E.   **Debtors' Prepetition Indebtedness**

21. As noted above, certain of the Debtors' obligations were satisfied in connection with the Closing, including their accounts payable and their obligations under the First Lien Agreement. Other than the litigation claims identified above, the primary claims remaining against the Debtors' estates are potential income tax claims related to the pre-Closing period, the claims held by the beneficiaries of the Rabbi Trust and the debt owed to RSWIS, as successor lender under that certain Second Amended Credit Agreement by and among WIS, Holdings and

Parent, as Borrowers, Cortland Capital Market Services LLC, as Agent and the Lenders from time to time Party Thereto, dated December 20, 2012 (the "Second Lien Agreement"). The remaining Debtors, other than Western are guarantors of the debt owed by WIS under the Second Lien Agreement. As of June 27, 2018, the remaining balance on the under the Second Lien Agreement was $123,770,583.97, consisting of $100,000,000.00 in principle $23,770,583.97 in unpaid interest.

### D. Restructuring Strategy

22. By these Chapter 11 Cases, the Debtors seek to effectuate a liquidation of their remaining assets and to wind-down their businesses in a responsible way. With the litigation against the Debtors halted by the automatic stay, the Debtors' limited remaining assets will be preserved for the benefit of all their creditors. Moreover, because the majority of the Debtors' creditors hold contingent, unliquidated or disputed claims, the Debtors intend to file a motion to set a bar date shortly after the commencement of these bankruptcy cases to identify and quantify the universe of claims that will be asserted against the Debtors' estates. The Debtors also intend to quickly seek an order from the Court requiring the trustee of the Rabbi Trust to turnover the trust's assets for the benefit of the Debtors' creditors.

23. Once the bar date has passed and the Rabbi Trust assets have been returned to the Debtors, the Debtors intend to propose a plan of liquidation that will provide for a distribution of their remaining assets to their creditors, followed by a dissolution of each of the Debtors in accordance with applicable law.

### PART II

24. Concurrently with the filing of these Chapter 11 Cases, the Debtors have filed two First Day Motions, which are primarily administrative in nature. The Debtors believe that approval of each First Day Motion is an important element of their reorganization efforts and is

necessary to ensure a smooth transition into chapter 11 with minimal dissipation of their remaining assets and disruption of their reorganization strategy. I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief requested therein is critical to the Debtors' ability to achieve a successful reorganization. Factual information with respect to each First Day Motion is provided below and in each First Day Motion.

    A.    **Motion of Debtors for Entry of Order Directing Joint Administration of Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b) (the "<u>Joint Administration Motion</u>")**

25.    The Debtors request that the Court authorize and direct the joint administration of these Chapter 11 Cases and the consolidation thereof for procedural purposes only. There are seven (7) affiliated Debtors in these Chapter 11 Cases. The Debtors believe that many, if not most, of the motions, applications, and other pleadings filed in these Chapter 11 Cases will relate to relief sought jointly by each of the Debtors. For example, the relief sought by the Debtors in the First Day Motions is sought on behalf of all seven of the Debtors. Joint administration of the Debtors' Chapter 11 Cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing these Chapter 11 Cases to be administered as a single joint proceeding instead of three independent Chapter 11 Cases.

26.    Joint administration of these Chapter 11 Cases will create a centralized location for the numerous documents that are likely to be filed and served in these cases by the Debtors, creditors, and parties-in-interest, and for all notices and orders entered by the Court. A single docket will also make it easier for all parties in each of the Chapter 11 Cases to stay apprised of all the various matters before the Court. The rights of creditors will not be adversely affected by the proposed joint administration of these Chapter 11 Cases; in fact, the rights of all of the creditors will be enhanced by the likely substantial reduction in costs resulting from joint administration of the cases. Finally, the Debtors believe, and I agree, that the joint

administration of these Chapter 11 Cases will simplify supervision of the administrative aspects of these Chapter 11 Cases for the Court and the Office of the United States Trustee for the District of Delaware.

27. Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates and creditors and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the Joint Administration Motion.

**B.  Debtors' Application for Entry of an Order Appointing JND Corporate Restructuring As Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), Bankruptcy Rule 2002(f) And Local Rule 2002-1(f) (the "Claims and Noticing Agent Application")**

28. In the Claims and Noticing Agent Application, the Debtor seeks to retain JND Corporate Restructuring ("JND") as its claims and noticing agent in these Chapter 11 Cases. I believe that by retaining JND in these Chapter 11 Cases, the Debtors' estates and their creditors will benefit from JND's service. I understand that JND has provided claims and noticing services in numerous chapter 11 cases in this District and has developed efficient and cost-effective methods in its area of expertise. I also understand that JND is equipped to handle the necessary mailings involved in properly sending the required notices to creditors and other interested parties in these Chapter 11 Cases and, therefore, I believe that the Claims and Noticing Agent Application should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated: July 2, 2018

WASHINGTON INVENTORY SERVICE

_____
Name: Timothy J. Bernlohr
Title: Chairman

**Exhibit A**

**Exhibit A**

WIS Holding Company, Inc.
d/b/a WIS International
Corporate Organization Chart

